Mr. Chief Justice Sharkey
delivered the opinion of the court.
The appellee, Kitturah Bryan, filed this bill in the superior court of chancery, to recover a tract of land on the Mississippi river, containing two hundred and forty acres, on part of which the town of Grand Gulf is now situated. She claims title, as the sole heir of Gideon Matlock, deceased. The title originated under the third section of the act of congress, passed on the 3d of March, 1803, which declared that every person, and the legal representatives of every person, who, being the head of a family, or above the age of twenty-one years, did, at the time of passing the act, inhabit and cultivate a tract of land in the Mississippi territory, not claimed by virtue of the preceding sections of the act, or by a British grant, or by the articles of cession from Georgia, should be entitled to the preference in becoming the purchaser at the minimum price, to be paid in the same manner as .directed by the act in regard to other lands, which was in four annual instalments. The fifth section of the act declared, that every person claiming land by virtue of a British grant, or by the three first sections of the act, or under the articles of cession, should before the last day of March, 1S04, deliver to the register of the land office of the proper district, a notice in writing, stating the nature and extent of his claim, together with a plot of the tract claimed, with every grant, order of survey, deed, conveyance, or other written evidence of his claim, to be recorded by the register; and in case of neglect by the claimant to comply with this provision, he lost all right under the provisions contained in the first three sections. By this act, three persons were appointed, or, at least, a provision was made for their appointment, as commissioners to hear and determine land claims. By the act of congress, of the 27th of March, 1804, the time for presenting claims under the first three sections of the original act, was extended to the last day of November, 1804.
To entitle any one to a preference, in becoming the purchaser of a tract of land, or, as it is commonly called, a preemption right, it is necessary that he should have brought himself within the conditions of the act, the first of which was, that the claim *265 ant should have been the head of a family, or over twenty-one years of age. He must have inhabited and cultivated the land on the 3d of March, 1803. He was required to present his claim to the register in writing, with the evidences of ownership, if he held by transfer, by the last day of November, 1804. Then he and his legal representatives were entitled to purchase the land, if it was unappropriated, or not claimed by virtue of the articles of cession, or by any British or Spanish warrant or order of survey, or by virtue of a donation under the second section, of the act.
Having thus stated the provisions of the law under which complainant claims, two questions arise ; first, does the record show that the complainant, or her ancestor, acquired a right under the law? and second, does that right still exist in her, or has it been legally divested?
First, has the complainant established a right to the land which can be asserted in a court of equity? We will here remark that in equity, as well as at law, the plaintiff must recover on the strength of his own title, and not on the weakness of his adversary’s title. Watts v. Lindsey’s Heirs, 7 Wheat. 161. In a court of equity a complete equitable title must be shown, and in a court of law a complete legal title is requisite. It is therefore immaterial on what right the respondents may rely; their possession will protect them against any but a perfect equitable title.
It has been urged in the argument of counsel for the appellants, that neither complainant’s ancestor nor the complainant herself were entitled to a preference, right under the act of congress for two reasons; first, because the land was claimed under a Spanish warrant, and therefore not subject to a preemption right; and second, because the provisions of the law were not complied with. The act of congress only conferred the right of preemption to land not claimed by virtue of the first two sections of the act, nor by a British grant, or the articles of cession from Georgia. A reasonable construction of this provision seems to be, that so long as land was subject to any such superior claim, it was exempt from the operation of the third section ; but when *266 such claim was decided to be invalid, and rejected by the commissioners, then it was liable to be claimed under a preemption right; it was then public land, unappropriated under the first and second sections, or under a British grant. When Matlock’s claim under the Spanish warrant was rejected as insufficient, the land was liable to be claimed under the preemption law. But were the conditions of the law sufficiently complied with, either by Matlock or his heirs ? It appears that Matlock was the head of a family, and competent therefore to assert a claim. But he must have inhabited and cultivated the land on the 3d of March, 1803. It was not enough to inhabit, or reside on the land; cultivation was also necessary. It was necessarily incumbent on any party claiming a preference to make the requisite proof to the commissioners. As proof in this cause, the complainant introduced an extract from the journal of the commissioners, bearing date the 10th of-July, 1805, from which it appears, that Gideon Matlock had claimed one thousand and sixty-six arpens of land, under a Spanish warrant of survey, granted to John Burnett on the 27 th of August, 1795. This extract also shows that Matlock derived title from Burnett by deed of bargain and sale, dated the 8th of February, 1804, which deed it would seem, was presented to the commissioners as the evidence of Matlock’s right to ha.ve a confirmation for the land which had been granted to Burnett by the warrant. A warrant of this description conferred ho title, unless the claimant was an inhabitant of the territory on the 27th of October, 1795, and had on that day inhabited and cultivated the land. Matlock could not, therefore, be confirmed in his title derived from Burnett, unless he could prove to the commissioners that Burnett had resided on and cultivated the land on that day. This proof he attempted to make by the testimony of Hezekiah Harmon, who stated, as the extract from the journal shows, that Burnett cultivated the land in 1802, and moved on it the same year, or the beginning of the year 1803, and continued to inhabit and cultivate it until he sold to Matlock. If Burnett lived on and cultivated the land until he sold to Matlock, he must have resided there on the 3d of March, 1803, when the act of congress was *267 passed. Matlock at that time had no claim to the land; his claim originated by the bargain and sale from Burnett on the 8th of February, 1804. There was no proof whatever that Matlock had resided on and cultivated the land on the 3d of March, 1803. Burnett might have been entitled to a preemption, but Matlock was not But in addition to this extract from the journal, the complainant also introduced the claim presented by Matlock to the commissioners. It bears date the 16th of February, 1804, and was for one thousand and sixty-six arpens of land, by virtue of the Spanish warrant to John Burnett, on which he relied. He presented no claim under the preemption law as the act of congress required, nor did he attempt to make proof that he was entitled to a preference. In the effort to sustain his Spanish warrant, he proved that he was not entitled to a preemption, by proving that Bu'rnett resided on and cultivated the* land up to the time when Matlock purchased, which was on the 8th of February, 1804, and twelve days afterwards he presented his claim to the commissioners. It has been admitted in argument that Matlock never claimed a right of preemption.
But it is said that Clarke, as the attorney for the heirs, presented their claim. Clarke filed a memorandum to this effect, that if Matlock’s claim under the Spanish warrant was not allowed, the heirs tVould take a preemption. This instrument is without date, and does not specify what land the heirs would take. For anything that appears, it may have been filed after the last day of November, 1804. Matlock died in October, 1804, and the time for pre'senting claims expired on the last of November of that year. But assuming that it was filed within the proper time, still it was not supported by the requisite proof of Matlock’s settlement. On the contrary, the commissioners then had proof before them that Burnett had resided on the land on the'3d of March, 1803, and if any person was entitled to a preemption it was Burnett. The probability is, that Matlock’s right to a preemption was confirmed on the strength of Burnett’s settlement, from whom he had purchased. Certain it is that Matlock’s heirs did not show that they were entitled to a preemption, in virtue of a settlement by their father. For anything *268 that appeared before the commissioners, Matlock may have resided in a foreign country on the 3d of March, 1803.
But let it be admitted that these were questions for the determination of the commissioners, and that their decision, allowing a preemption in favor of Matlock’s legal representatives is conclusive, which may be true, at least as regards the government. Then the question is, what right did it confer? The most important provision of the law still remained to be complied with; the land was to be paid for. The determination of the commissioners settled nothing but that Matlock’s representatives had a right to buy the particular tract.of land if they wished to do so. A mere right of preemption is not a title. It is only a proffer to a certain class of persons that they may become purchasers if they will. Without payment, or an offer to pay, it confers no equity. It is only regarded as conferring an equity when the party has consented to accept the offer by payment, or by claiming the benefit of the law in the proper manner, within the required time. The bill proceeds upon the ground, that the first payment for the land was made by, or for the heirs of Matlock ; and the whole argument is based on this ground. It is the important point in the cause. Without it the complainant’s claim has nothing to rest on. There is no proof on this" subject which can be called positive, and yet the circumstances are so irresistibly conclusive against the pretensions of the complainant, that it seems impossible to entertain a doubt. This is a question of fact, and each prominent event in the cause seems to contribute something to the answer. When they are all considered in chronological order, the conclusion seems, inevitable, and to that end we shall note each one particularly.
1. On the 16th of February, 1804, Gideon Matlock, of Claiborne county, presented to the 'commissioners appointed under the act of congress of March, 1803, a claim for one thousand and sixty-six arpens of land, lying in Claiborne county, on the Mississippi river, having such shape as represented by a plat annexed, by virtue of a decree warrantor order of survey from the Spanish government to one John Biirnett, bearing date the 2?th of August, 1795, which claim states that the land was im *269 proved at the date of the warrant, and that Burnett was the head of a family; that Burnett had the land surveyed, and conveyed it to Gideon Matlock. Accompanying this petition is a survey of the land. This was the only step taken by Matlock in his lifetime.
2. He died in October, 1804, and on the 16th of that month, administration was granted to his widow, Elizabeth Matlock, the mother of complainant.
3. On the 23d of October, 1804, Matlock’s estate was appraised to $676.
4. On the 13th of March, 1805, the probate court of Claiborne county made an order that the land of Matlock, being the land in question, should be sold by the administratrix to. pay the debts due from the estate.
5. On the 10th of July, 1805, the commissioners made an entry on their journal, as appears by an extract, that the legal representatives of Matlock claimed one thousand and sixty-six arpens of land in Claiborne county, on the Mississippi river, by virtue of a Spanish warrant of survey to John Burnett, dated the 27th of August, 1795; also a bargain and sale from Burnett to G. Matlock, deceased, dated 8th February, 1804, which was produced. Witness, Hezekiah Harmon, proved, that the land in question was settled in the year 1802 by John Burnett, who moved on it the latter end of the same year, or the beginning of 1803, and continued to inhabjt and cultivate it until he sold to Matlock. Burnett was the head of a family at the date of the warrant. This was probably the first action taken by the commissioners, on the claim which had been presented by Matlock on the 16th of February, 1804; and the deed of bargain and sale from Burnett, and the testimony of Harmon mentioned in the entry, were no doubt both furnished by Matlock when he first presented his claim. He, in the meantime, had died, of which fact the commissioners by some means, but how is not shown, had been apprized, and hence the entry on the journal that Matlock’s representatives claimed the land. The fairest conclusion is, that Elizabeth Matlock, the administratrix, was prosecuting the claim. But a few months before she had obtained *270 an order to sell the land to pay debts. A confirmation of the claim was most likely to insure a sale for a fair price. It was her official duty to prosecute all claims in favor of the intestate. The order of sale was granted on the 13th of March, 1805; in the report of sale it is stated by the administratrix, that she advertised the land for sale in three public places in the comity, and in one of the newspapers of the territory, but no sale was made for want of bidders. She was then for a time induced to abandon or postpone the compliance with the order of court, in consequence of doubts as to the title of Matlock. She however again advertised and sold. Pending this action of the adminis-tratrix, the entry mentioned was made on the journal of the commissioners. With her knowledge of the defect of title, and with an order to sell it still unexecuted, though an effort bad been made to sell, which failed probably from the defect of title, the inference is that the administratrix undertook to perfect the title. This inference derives strength too from the fact, that the children were very young, and had no guardian but the mother. Having said this much in regard to the entry appearing on the commissioners journal;.let us proceed with the facts as proposed.
6. On the 13th of August, 1805, commissioners were appointed by the probate court to receive claims against the estate of Matlock, and ordered to make report at the next term of the court.
7. The administratrix sold the land, after a second advertisement, on the 10th of December, 1805, to Hezekiah Hannon, for fifty dollars, he being the best bidder.
8. At the February term, 1806, the administratrix reported the sale to the probate court, which report was received and ordered to be recorded. It states that the estate had been reported insolvent; the order authorizing the sale for the benefit of creditors; the due advertisement of the land; the failure to sell for want of bidders; the second advertisement, and the final sale to H. Harmon for fifty dollars on the 10th of December, 1805.
9. On the 13th of February, 1806, Elizabeth Matlock, as ad-ministratrix, made a deed to Harmon, the purchaser. It recites the order of court, and professes to convey only Matlock’s *271 interest or claim to a preemption right, to a tract of land on the east bank of the Mississippi river, containing about six hundred and forty acres, more or less, which deed was acknowledged on the same day, 13th of February.
10. Mrs. Matlock died in March, 1806, the complainant then being about four years of age, and her brother Thomas, who has since died, about two years old. After the death of the mother, the children had neither parent, guardian, or relation near to protect their persons or property, nor was a guardian appointed for them at any time.
11. On the 11th of August, 1806, Joshua G. Clarke was appointed administrator de bonis non on the estate of Matlock, and on the same day commissioners were again appointed to receive and examine claims against the estate of Matlock.
12. On the 19th of December, 1806, the land commissioners entered on their journal, that two hundred and forty acres of land should be surveyed for the legal representatives of Gideon Matlock ; and on the 22d of the same month, they made an entry to the following effect. No. 271. Legal representatives of Gideon Matlock; 240 acres ; claim confirmed;
13. On the 23d of December, 1806, only one day after the confirmation, Harmon, by indorsement on the deed from the ad-ministratrix, transferred his interest to Samuel Wallace.
14. On the first of January, 1807, John Henderson, as receiver of public moneys, gave a receipt in favor of the “ legal representatives of Gideon Matlock” for $120, as the first instalment on two hundred and forty acres of land under a preemption right; charging at the same time, in the books of his office, the representatives of Matlock as debtor in the sum of $480 for the tract of land, and giving a credit of $120.
15. In the latter part of the year 1807, the complainant and her brother Thomas were taken to Louisiana by a relativé who resided in that state, where they remained. Complainant there married in 1817, and was under coverture until 1838.
16. On the 3d of January, 1810, Wallace, the assignee of Harmon, sold to Charles Patterson by deed, which, after describing the laud, recites that it was the same land granted by *272 preemption certificate to the legal representatives of Gideon Mat-lock, dated 1st of January, 1807. The land was conveyed subject to the instalments due the United States, which were to be paid by Patterson. To this deed we find the name of J. G. Clarke as a witness, who was doubtless the same person who was administrator on Matlock’s estate, and who had signed his name as attorney for the heirs in their petition for a preemption in case the Spanish warrant was not confirmed.
17. Let us for a moment return to the proceedings of the probate court, which present the next occurrence in point of time. On the 12th of February, 1810, other commissioners were appointed in the room of those previously appointed, to receive claims against Matlock’s estate, this being the third appointment of commissioners for that purpose. ,
18. On the 22d of September, 1810, Patterson paid the three remaining instalments due on the land, and took from the receiver a certificate in his own name, as assignee of the legal representatives of Gideon Matlock. The respondents derive title from Patterson.
There are some facts which cannot be precisely located in point of time. The memorandum of Clarke as the attorney for the heirs, that they would take a preemption if the claim under the Spanish warrant was not confirmed, is without date. There is also a memorandum, the date of which cannot be precisely ascertained from the record ; it is in these words: “The claimant requests that the board of commissioners will only grant or reduce the within quantity to two hundred and forty acres.”
Do these facts prove that the first payment, made on the 1st of Jaquary, 1807, was made by or for the heirs of Matlock ?' We cannot think that they will justify any such conclusion. The heirs were infants, one but a little over four years old, and the other not three. They of course did not make the payment. It is perfectly manifest, therefore, that it was made by some other person, and it would seem to be incumbent on the complainant to show by whom it was made, if made for her benefit. It was not made by Elizabeth Matlock ; she had died in 1806. *273 It was not made by a guardian of the children, for none had been appointed. They had no relations in the territory, and it is not probable that any came from a distance to pay for the land. If such had been the case, a guardian or agent would most probably have been appointed to take care of it. It would be strange too, that relations should come from a distance to make one payment, and leave the land to be forfeited for the non-payment of the remainder. The first we hear of any relation in the territory was in the latter part of 1807, when one came from Louisiana to take the children away. The complainant’s hope then must rest on the chance of payment by Clarke, the administrator de bonis non, who was appointed in August, 1S06. There are several reasons which go to prove that he did not make the payment. He was successor to Elizabeth Matlock, and had full notice of all that she had done in the course of administration. He knew that an order had been made to sell the land; that it had been sold accordingly, and conveyed to Harmon. He knew also that the order had been made to enable the administratrix to pay the debts. It is not likely, under these circumstances, that he would have paid for the land for the benefit of the heirs. He had no authority as administrator to make such payment out of the money of the estate. But a still more conclusive reason is, that the estate was insolvent. This fact, however, was denied in argument, but it is nevertheless fully shown. Commissioners were appointed to examine claims against the estate at three different times, twice under the administration of Clarke, and once under the administration of his predecessor, who, in her report of the sale of the land, stated that the estate had been reported insolvent, besides which the order of sale purports to have been made, to enable the administrator to pay debts. The only contingency which authorized the appointment of commissioners to receive claims against an estate was insolvency ; and the only contingency which then authorized the sale of land of a decedent was insolvency. It is thus made manifest that the estate was insolvent. Clarke then had no funds belonging to the estate which he could have appropriated to the payment of the *274 land, even if he had received anything whatever, which is not shown. The creditors had the first claim on the estate; the law appropriated the money to their use. To suppose that Clarke paid for the land out of the money of the estate is to suppose that he violated the law and his oath of office. The estate was only worth $675. That sum, or the property to that amount, went into the hands of the first administrator. For anything that appears, Clarke may never have received anything whatever. But it is very remarkable that if he made the first payment, that he did not also complete the purchase. He continued to be administrator as late as 1825 ; and was cognizant of the sale from Wallace to Patterson. The estate was originally worth $675 besides the land; it was necessary that the land should be sold to pay debts; it was sold for $50; this made the whole of an insolvent estate amount to $725 ; is it possible under such circumstances, that any administrator would undertake to appropriate $480 of that sum to the payment of land which had been sold by his predecessor, and thus contributed to swell the aggregate of the estate. This argument necessarily supposes that the land was sold that the vendor might pay for it out of the proceeds of sale, and perfect in himself a title which was before imperfect. But moreover, it is but recently that sales of land by administrators have been the subjects of adjudication in this state. It is now settled that the law must be strictly complied with, and that this must appear by the record. No such decision had been made previous to this sale, at least in the then territory; and the earliest case referred to by counsel to show that the sale was void, was decided in 1818, thirteen years after the sale was made, and the next one was decided in 1830. It can scarcely be doubted, therefore, but what all parties believed the sale to be valid, and if so, it is impossible that an administrator would have thought of making such-an investment, even if he had had the means and the power. But to admit the most,for the complainant, it must have been regarded at least as a doubtful question at that day, even if the law had not been literally complied with; and if so, it is not probable that an administrator would have invested the funds of the es *275 tate in a doubtful adventure. Surely no lawyer would have advised such a course, nor could the probate court have sanctioned such an appropriation, and the payment could not have been made without an order of court.
But, say the complainant’s counsel, the proof is clear that the payment was made by Matlock’s heirs, because the confirmation of the commissioners, made on the 22d of December, 1806, was in favor of the “ legal representatives” of Gideon Matlock; and the certificate of payment given by the receiver on the 1st of January, 1807, was in favor of the “ legal representatives” of Matlock; that by the term “legal representatives” children were meant. As regards the certificate of confirmation, this is a matter of little consequence, as it only decided that the legal representatives of Matlock had a right to avail themselves of the preemption law, if they should choose to do so. And let it be admitted that the receiver meant the children of Matlock, by the use of the words “legal representatives;” what then? If it be clear that they paid nothing, then they acquired a title by mistake, which, howev.er good at law, will not do to rely on in a court of chancery. It will not be contended that such receipt is not susceptible of explanation. But we deny that the words “ legal representatives,” as used in the act of congress, mean children, or heirs only. In legal parlance, the execptor or administrator is most commonly called the legal representative. Still, in regard to things real, the heir is also the legal representative, and so is a devisee, who takes by purchase. Heirs may be the legal representatives, or they may not. Suppose by will a testator should give his land to one who is not an heir; the devisee would be the legal representative, in regard to the thing devised. The act of congress was evidently intended to have a broader signification than that contended for. This is manifest from the fifth section,',which required that'any claimant should file with the register every grant, order of survey, deed, conveyance, or other written evidence of his claim. There was no provision in favor of assignees or grantees, by name, yet we find they were required to present their evidences of title; they were necessarily intended to be embraced by the use *276 of the phrase “legal representatives.” If the word “heirs” only had been used, it would have excluded assignees and grantees. An assignee or grantee is a legal representative of the assignor or grantor, in regard to the thing assigned or granted. If congress intended that heirs only should be entitled to represent the original settler, it is remarkable that the word “ heirs” was not used. Its meaning is well known; it is the appropriate expression when those on whom the law casts the estate are spoken of. And as congress used a phrase more comprehensive, we must suppose that other persons besides heirs were intended. General expressions in a law must be construed to have a general application, unless there be a clear indication that they were intended to be used in a restricted sense. Representative is one who exercises power derived from another. A purchaser derives his power over the estate from his vendor. On this interpretation of the words “ legal representatives,” the complainant’s claim doubtless originated. We have said that Matlock was probably confirmed in his right to a preemption, in virtue of Burnett’s settlement, but we regard this point as beyond mere probability. It appears that Burnett resided on and cultivated the land, in March, 1803; and it also appears that Matlock had no interest in, or claim to it, or that he ever resided on it, until 1804. Ha was no doubt confirmed in his claim as the legal representative of Burnett. This is the only way we can account for the confirmation by the commissioners, as Matlock actually disproved any right in himself, on his own settlement.
The certificate of payment, then, given by Henderson on the 1st of January, 1807, would establish a payment by the purchaser under the administrator’s sale, or his vendee quite as well as it proves payment by the complainant. When the complainant asserts that the -money was paid by her, the onus is with her, and she must make proof aliunde. Where there is an ambiguity, the person claiming under the instrument must explain it. When a description suits two persons, the claimant must show that he was the person intended. The complainant has not only failed to make the requisite proof, but the proof *277 in the record shows that she and her brother were not the persons intended in the receiver’s receipt. We have already shown that they did not pay anything; the receiver, no doubt, intended to give the receipt in favor .of the person who paid the money. There was proof before him that Matlock’s interest had been sold- In confirmation of this' statement, the copies of the deed from Elizabeth Matlock to Harmon, and his assignment to Wallace, and also Wallace’s deed to Patterson, which have been introduced in this cause, were taken from the originals on file iii the register’s office, as appears by his certificate. How is this to be accounted for? The probate court office, where they were originally recorded, is the proper depository for deeds. This is a strong circumstance to prove that they were filed there as proof to the register that the interest of Matlock had been sold, and that the purchasers had a legal right to make the payment under the certificate of confirmation. Such proof was necessary, for, as it had been decided that Matlock was entitled to preemption, no person could be permitted to enter the land, unless he could deduce title, and show that he was the legal representative of Matlock in the matter. These deeds were not filed as the evidences of title under the act of congress, as the dates will show. The claim had already been, confirmed to Matlock, who had, under the act of congress, filed, as an evidence of his right, the deed from Burnett. In this circumstance is found too a very satisfactory answer to the charge of a fraudulent entry. The register was in possession of the chain of title, and evidently acted on the supposition that Matlock’s right had been legally divested. The claimant fully disclosed his pretensions to ownership, and the register must have regarded his right as sufficiently established. But this is not the only circumstance. On the 22d of December, 1806, the commissioners confirmed the claim. On the 23d of the same month, only a day after the act of confirmation, Harmon assigned to Wallace ; and eight days afterwards, on the 1 st of January, 1807, the entry was made. This train of events points very naturally to Wallace as the individual who made the entry, and who was recognized as the legal representative of Matlock. On the 3d *278 of January, 1810, Wallace sold to Patterson, and by the recitals in the deed showed an entire familiarity with the whole transaction. On the 22d of September, 1810, Patterson made final payment, and took the receipt in his own name, as the assignee of the legal representatives of Matlock. What evidence did he exhibit of his being the assignee 1 The deed from Wallace, as we must suppose, for it is still in that office, and could have been placed there for no other purpose. Then, if he was as-signee of the legal representative of Matlock, that legal representative must have been Wallace. Here is a complete admission by the register that Wallace was recognized as the legal representative. On that ground alone was the receiver authorized to permit Patterson to make final payment. The charge in the bill is, that Patterson represented himself as the assignee of the heirs. He was not probably so inconsiderate as to profess to claim under them, and at the same time to furnish evidence that he claimed under Wallace, the validity of whose title depended on a divestiture of the right of the heirs. The complainant then has totally failed in the important particular of payment. In her effort to establish a right, she has furnished the most incontestable evidence that it is without foundation. A mere naked right of preemption she may have once had ; but it was not of itself a title, either at law or in equit3>\ She did not consummate the right by paying the purchase-money whilst the proffered contract was open for acceptance. The argument that, as the respondents profess to derive title from the legal representatives of Matlock, they are estopped from denying complainant’s title, she being the legal representative, is entitled to no weight. They are not estopped from objecting to the sufficiency of complainant’s title, even if they claimed under her. Their possession is a sufficient protection against any but a good title. It maybe that they have no title: and even if such appears from the record to be the fact, it does not help the complainant. They do not, however, profess to claim title through her, for they deny that she was the person intended by the receiver in his receipt of payment. They trace title through the administrator’s sale, and insist by that act, the complain *279 ant’s title, if she had any, was legally divested; or rather that it was defeated by the sale of Matlock’s interest to Harmon.
Concurring, as we do fully with the counsel of the appellants in the view taken of the facts of the case, we are not called on to make an application of the principles presented in the very profound and interesting argument addressed to us on the law of the case. That argument was only intended to meet a different view of the facts. We may be permitted to remark, however, that possession is an apparent right, and when it has been long continued, it is highly favored by the law, which sustains it by all reasonable presumptions. The authorities abundantly prove that, in favor of long possession, almost every variety of written evidence of title will be presumed. The defective links in the chain of title will be supplied by presumption, and the title declared perfect, where the possession has been continued for a great length of time without interruption. The statute of limitations is but a recognition of the same principle, differently applied. We are not required by the state of the case to apply the doctrine of presumption, arising from lapse of time. All presumptions are in favor of the possessor; none against him. The respondents, who are in possession, have abundant protection in the weakness of complainant’s title, without a resort to the presumptions of law to supply a supposed defect in their own.
Let the decree of the chancellor be reversed, and the bill dismissed.